STATE of Missouri, Plaintiff–Respondent,

v.

Paul R. TAYLOR, Defendant–Appellant.

No. 25559.

Missouri Court of Appeals, Southern District, Division One.

Jan. 21, 2004.

Ellen H. Flottman, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Karen L. Kramer, Assistant Attorney General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Paul R. Taylor ("Appellant") was charged by information with murder in the second degree, a violation of Section 565.021.[1] Following trial by jury, he was convicted of the lesser-included offense of involuntary manslaughter, a violation of Section 565.024. Having found him to be a prior offender under Section 558.016, the trial court sentenced Appellant to seven years imprisonment.

In his sole point on appeal, Appellant charges that the trial court plainly erred in submitting to the jury instructions on the lesser-included offenses of voluntary manslaughter and involuntary manslaughter, claiming that doing so violated Appellant's

---

**1.** References to statutes are to RSMo (2000) unless otherwise indicated.

due process right to pursue an "all-or-nothing" strategy to avoid conviction. We disagree, affirm the trial court's judgment in part, and remand for correction of a clerical error in the judgment.

Appellant does not dispute the sufficiency of the evidence supporting his conviction. Viewed in the light most favorable to the jury's verdict, the evidence revealed the following: on the night of September 15, 2000, Tracy Tucker ("Tracy")[2] and her husband, Gary Tucker ("Gary"), went to the Jolly Roger Bar in Taney County, Missouri to celebrate a friend's wedding. When the bar closed at 1:00 A.M., Tracy invited Appellant and his wife to her home for a drink.

Appellant and his wife followed the Tuckers to their home, arriving at approximately 1:10 A.M. Gary immediately went to bed, while Tracy, Appellant, and his wife sat at the kitchen table and talked for approximately twenty to twenty-five minutes. Tracy and Appellant's wife then walked down the road to a friend's house.

The Tuckers' oldest son, fifteen-year-old Brian Tucker ("Brian"), was also home, asleep in his bedroom. He was awakened when Appellant came into his room after Appellant's wife and Tracy left the home. Appellant complained about music that was playing on Brian's stereo, stating that it was the "devil's music." Brian asked Appellant to leave and, when Appellant refused, Brian told him to "shut the f— up" and "get the f— out of [his] room," at which point Appellant complied.

Brian fell asleep but was again awakened, this time by Appellant knocking on his bedroom window and asking Brian to box with him. Brian told Appellant that he did not box and went back to sleep.

Also that night, Brian Watker ("Watker") was visiting his friend, Robert Wylder ("Victim"), with whom he talked and drank beer until approximately midnight. At that point, Watker believed he was too intoxicated to drive safely to his home in Springfield, Missouri, so Victim volunteered to take him there. Watker accepted the offer and fell asleep in the passenger seat as Victim drove.

When the truck Victim was driving stopped, Watker believed they had arrived at his home. In fact, Victim had driven to the portion of Creed Road adjacent to the Tuckers' residence, apparently seeking to purchase marijuana. Watker began to get out of the truck and saw Appellant walking toward him carrying a beer bottle. Appellant hit Watker above the eyebrow with either his fist or the beer bottle. Watker was knocked unconscious by the blow and fell to the ground.

When Watker regained consciousness, he saw Victim lying on his back outside the driver's side of the truck. Appellant was on top of him, hitting him repeatedly. Watker tried, unsuccessfully, to pull Appellant off Victim before he left to seek help, taking a small grease gun with him for protection. He knocked on the door to several homes before someone responded to his pleas and called the police.

Meanwhile, Gary was asleep alone in his bedroom when he was awakened by the sound of Appellant coming down the hall. Appellant, who appeared bloody and beaten, entered the bedroom, turned on the light, and said, "You've got to help me, I'm hurt real bad," before going to the bathroom to attempt to wash off the blood. Gary asked Appellant what had happened, and Appellant said he thought he had seri-

2.  The use herein of given names, rather than surnames, is for the sake of clarity; no disre-spect is intended.

ously injured someone, and that he in fact may have killed the person. Gary asked whom he had killed, fearing the person may have been his wife or son. Appellant, however, kept repeating, "I thought I hurt somebody real bad" and "I'm hurt real bad."

After refusing Gary's repeated offers to call for medical assistance or to call the police, Appellant left the Tuckers' home. Gary locked the door before going into Brian's room and waking him. Through his bedroom window, Brian saw and heard Appellant lying on the ground, shouting, "I think I killed somebody." Appellant then got in his truck, after which Gary and Brian heard him honking the horn and shouting for his wife.

Shortly thereafter, Deputy Christopher Kaempfer ("Kaempfer") of the Taney County Sheriff's Department went to the Tucker residence. As Kaempfer neared the scene, Watker, who was extremely excited and upset, flagged him down. When Kaempfer stopped, Watker told him his friend had been assaulted nearby and directed Kaempfer to the scene.

Kaempfer went with Watker to the intersection of Julie Lane and Creed Road where he observed Victim lying in the middle of the road on his back. Victim's arms were spread out and there was blood around his nose and mouth. He did not appear to be breathing and had a C-clamp, which had come from a paint can in the back of Watker's truck, in his right hand.

Sergeant Timothy Matthews ("Matthews") of the Rockaway Beach Police Department also responded to a call to the area of Julie Lane and Creed Road. When Matthews arrived, he noticed a dark-colored Mazda pickup truck with its headlights lit. Near the truck he saw a man, whose face was covered with blood, lying in the road.

Matthews then made contact with Appellant, who was seated in another pickup truck blowing the horn. Matthews saw that Appellant too was covered in blood, from his shirt to the thighs of his blue jeans. Matthews also noted a cut on the back of Appellant's head. As they waited for an ambulance to arrive, Appellant repeatedly asked Matthews what had happened and then looked at Matthews and said, "I remember you from the Jolly Roger bar tonight." Matthews told Appellant he was correct, as Matthews had been at the Jolly Roger earlier that evening and had seen Appellant there.

When ambulance personnel arrived, they asked Appellant to step out of the truck so they could treat his injuries. Appellant became combative and pushed one of the paramedics away, at which point Matthews and another officer tried to handcuff Appellant. Eventually, four officers were required to place Appellant on the ground and handcuff him. After being taken to the ambulance, Appellant, who smelled of intoxicants, began calling for his wife. He was treated on the scene for the aforementioned cut, as well as scratches and abrasions and cuts on his hand. He was later transported to a local hospital, where he was treated and released.

Deputy Dan Luttrell ("Luttrell") also responded to the scene and spoke with Watker, who stated that he and Victim had gone to the area to purchase marijuana. He said that as they were backing the truck into a driveway, Appellant came to them, opened the truck door, and hit Watker. Watker said he asked Appellant what was going on but, rather than respond, Appellant went to the other side of the truck to confront Victim, striking him on his head with a beer bottle when he attempted to get out of the truck.

Victim was pronounced dead at the scene. In addition to the blood on his face,

the clothing on his upper body was saturated with blood. Droplets of blood that appeared different in color than the blood around his head were found on Victim's abdomen. There was a red substance and dirt on the threads of the C-clamp, and remnants of a beer bottle were found under Victim's left shoulder and arm. Blood was also found in the driver's side of the passenger compartment of Watker's truck.

Victim's injuries were traumatic: he suffered numerous lacerations to his face and head, blunt trauma to his face, scalp, and neck region, and compound fractures of his facial bones, including the nose. Several of his teeth had been knocked out. He had significant bruising around his scalp, mouth, and neck, and his hyoid bone was broken, causing his airway to collapse and rendering it impossible for him to breathe. Victim's lungs were full of blood, indicating that he had aspirated blood due to profuse bleeding from the back of his nose down his throat. His stomach was also full of blood. Victim died from asphyxia caused by the collapse of his airway and by bleeding into his lungs that resulted from the fracture of his facial bones. Essentially, Victim drowned in his own blood. Some of his injuries were found to be consistent with having been struck by a C-clamp. Victim suffered no defensive injuries to his hands or arms.

DNA tests revealed the blood on the C-clamp was consistent with that of both Victim and Appellant. Blood found on the inside surface of the driver's door of Watker's truck was statistically indistinguishable from Appellant's. Victim's blood, but not Appellant's, was found on the driver's side floorboard and running board of Watker's truck.

In his testimony at trial, Appellant claimed he was in the Tuckers' trailer when Watker and Victim knocked on the door. According to Appellant, the men were looking for Gary. Appellant testified he told them that Gary was asleep and that he could not allow them in because it was not his trailer. Appellant said that the men grew angry and left. He testified that about ten minutes later, when he went outside to look for his wife, Watker and Victim got out of the truck and attacked him, allegedly grabbing him around his chest. Victim allegedly struck Appellant's face. Appellant testified he fought Victim because he believed he was in danger and that Victim was the main threat. According to Appellant, the next thing he remembered was getting up from the ground and walking back to the Tuckers' trailer. Appellant remembered seeing Victim lying on the ground, but denied striking Watker or that he was the first person to hit anyone. Appellant claimed not to remember beating Victim to death.

Appellant also presented the testimony of Louis Mire ("Mire"), a physician who treated his injuries the night of Victim's death. Mire testified that Appellant had some amnesia regarding the event and was confused about details concerning what happened that night, but that he was alert and answered questions appropriately. Mire testified he found several cuts and bruises on the back of Appellant's head and a laceration on his left hand and that he diagnosed Appellant with a cerebral concussion. Mire acknowledged that Appellant's apparent memory loss could have been the result of his drinking twelve beers that night.

The jury found Appellant guilty of involuntary manslaughter, and the trial court subsequently sentenced him as indicated above. This appeal followed.

In Appellant's sole point on appeal, he alleges that it was plain error for the trial court to instruct the jury on the lesser-included offenses of voluntary manslaugh-

ter and involuntary manslaughter[3] over the objection of Appellant's trial counsel because Appellant had a "due process right to pursue an 'all[-]or[-]nothing' defense" at his discretion. Appellant claims that "the right to a lesser[-]included offense instruction can be waived where [a defendant] chooses to take his chances with the jury, and since the jury acquitted [Appellant] of murder in the second degree, he would have been acquitted outright and not convicted of involuntary manslaughter."

■■■■ Appellant correctly notes that since the error claimed in Appellant's point was not raised in his motion for new trial, any review of the claimed error must be for plain error only. *See* Rule 30.20;[4] *State v. Ervin*, 835 S.W.2d 905, 921 (Mo. banc 1992). Relief under this standard is granted only when the alleged error "so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably results if left uncorrected." *State v. Varvera*, 897 S.W.2d 198, 201 (Mo.App. S.D.1995). Such review is to be applied "sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997), *cert. denied*, 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). Where, as here, the alleged error involves the giving of instructions, relief under a plain error review is warranted only when it is clear that the trial court so misdirected or failed to instruct the jury that it is apparent the error affected the jury's verdict. *State v. Gaskins*, 66 S.W.3d 110, 113 (Mo.App. S.D.2001) (citing

*State v. Beeler*, 12 S.W.3d 294, 300 (Mo. banc 2000)).

■ We are compelled to conclude that the trial court did not plainly err in giving the lesser-included offense instructions. The Notes on Use to MAI–CR 3d 313.08—the instruction on voluntary manslaughter—state that once evidence of sudden passion arising from adequate cause has been introduced, and an instruction on voluntary manslaughter is requested by a party, or on the court's own motion, the voluntary manslaughter instruction "will be given." MAI–CR 3d 313.08, Notes on Use 3. Here, there was evidence of sudden passion arising from adequate cause in that there was testimony that Victim and Watker assaulted Appellant. The State requested the instruction on voluntary manslaughter. Therefore, the trial court was obliged, per the Notes on Use governing MAI–CR 3d 313.08, to give the voluntary manslaughter instruction to the jury. Moreover, even if it were not the case that the trial court was obliged to give the instruction on voluntary manslaughter, Appellant could not possibly have been prejudiced by the giving of that instruction, since he was convicted of involuntary manslaughter.

■ As for the involuntary manslaughter instruction, a supplemental Note on Use to MAI–CR 3d 313.10—the approved instruction on involuntary manslaughter—states that the instruction on involuntary manslaughter "will be given" if justified by the evidence and if requested by one of the parties or on the court's own motion. MAI–CR 3d 313.00(4)(A)(4). Here, the in-

---

3. Section 556.046.1(2) states that a defendant may be convicted of an offense included in an offense charged in the indictment or information, and that an offense is so included when it is specifically denominated by statute as a lesser degree of the offense charged. Voluntary manslaughter and involuntary man-

slaughter are lesser-included offenses of second-degree murder. Section 565.025.2(2)(a)-(b).

4. References to rules are to Missouri Rules of Criminal Procedure (2003) unless otherwise indicated.

voluntary manslaughter instruction was justified by the evidence in that the extent and severity of Victim's injuries suggest Appellant could reasonably have been found reckless as to the amount of force he used to repel what he perceived as an attack by Victim. The record also reveals that *Appellant* requested the instruction on involuntary manslaughter, seemingly foreclosing the possibility that his due process right to pursue an "all-or-nothing" defense was abridged. In any event, as with the instruction on voluntary manslaughter, the trial court was required to give the instruction on involuntary manslaughter in that the evidence supported the submission of the instruction and the instruction was requested by a party.

Given the foregoing, it seems to us appropriate that Appellant does not argue that the instructions on the lesser-included offenses were not supported by the evidence or that the trial court in any way violated the Notes on Use in giving the instructions. Rather, Appellant's sole argument is that he was thwarted in his desire to pursue an "all-or-nothing" defense, to the derogation of his due process rights, because instructions were given on the lesser-included offenses "over [his] objections."

■ Appellant's argument is without merit. First, the record before us does not reflect Appellant's wish to pursue an "all-or-nothing" defense, as Appellant's trial counsel never stated on the record that such was his intent. Counsel objected to the voluntary manslaughter instruction and the *trial court* asked Appellant whether his objection was based upon a desire to pursue an "all-or-nothing" defense. Before Appellant's counsel answered, the trial court ordered that the discussion be continued off the record. When the court went back on the record, Appellant's only stated objection to the voluntary man-

slaughter instruction was that he did not feel it was supported by the evidence, a claim he does not raise here. Appellant never asserted *for the record* that he wished to pursue an "all-or-nothing" defense.

Second, Appellant's argument here that he preferred an "all-or-nothing" approach to instructing the jury is refuted by the fact that it was he who requested the involuntary manslaughter instruction. That Appellant may understandably have felt "obliged" to offer the involuntary manslaughter instruction in light of the trial court's (correct) decision to submit an instruction on voluntary manslaughter is, in the end, immaterial in determining whether his due process rights have been violated. There is no circumventing the fact that it was Appellant's choice to give the jury yet another option to convicting Appellant of second-degree murder or voluntary manslaughter. We are hard-pressed to find the trial court committed plain error to the detriment of Appellant's due process rights by submitting an instruction Appellant requested.

Even if Appellant had indicated he wanted to pursue an "all-or-nothing" defense, his claim would have no merit. As noted above, the Notes on Use allow not only the defendant but either party, or the court on its own motion, to request the submission of the instructions on voluntary manslaughter and involuntary manslaughter. Appellant relies upon cases in which the issues included (1) whether, in a post-conviction proceeding, trial counsel can be found ineffective for *failing* to request or by *waiving* instructions on lesser-included offenses (*State v. Theus,* 967 S.W.2d 234, 241 (Mo.App. W.D.1998)) or (2) whether an appellant is entitled to reversal of his or her conviction where the trial court fails to *sua sponte* give the lesser-included offense instructions (*Ervin* at 921–22). Clearly,

these cases have potential relevance where the issue to be decided is whether there is error when instructions are *not* given. Appellant cites no authority, however, for the proposition that a trial court commits plain error when the instructions on lesser-included offenses *are* given in compliance with the Notes on Use governing those instructions. Nor are we aware of any such authority.

The instructions on the lesser-included offenses of voluntary manslaughter and involuntary manslaughter were supported by the evidence and were requested by the State and Appellant, respectively. The trial court was required, therefore, per the provisions of the Notes on Use accompanying those instructions, to give them to the jury. Appellant's claim that the trial court plainly erred in giving the instructions must be denied.

Finally, we note that the record contains a judgment in the form of a "check the box"—style document, entitled "Amended Sentence and Judgment," which incorrectly indicates that Appellant was not adjudged a prior offender under Section 558.016. As indicated above, however, such a finding was made by the trial court from the bench during trial, and Appellant was indeed sentenced as a prior offender. The failure to memorialize accurately the decision of the trial court as it was announced in open court was clearly a clerical error. "Rule 29.12 permits a trial court to correct such clerical errors in the judgment that obviously are a result of oversight or omission." *State v. Booyer,* 87 S.W.3d 926, 931 (Mo.App. S.D.2002); *see also State v. Box,* 956 S.W.2d 460, 463 (Mo.App. S.D.1997). Therefore, while we affirm Appellant's conviction and sentence, we must remand with instructions to the trial court to enter a written judgment reflecting the judgment and sentence as they were announced by the trial judge in open court.

BARNEY, P.J., and PREWITT, J., concur.