

# In the
# Missouri Court of Appeals
# Western District

STATE OF MISSOURI,

              **Respondent,**

v.

RONALD L. DAVIE,

              **Appellant.**

**WD83020**

**OPINION FILED:**

**DECEMBER 21, 2021**

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Bryan Round, Judge**

**Before Division Two: Mark D. Pfeiffer, Presiding Judge, Gary D. Witt, Judge,
Anthony Rex Gabbert, Judge**

Ronald L. Davie appeals the circuit court's judgment, entered after a jury verdict, convicting him of one count of sodomy in the first degree, Section 566.060,[1] and one count of incest, Section 568.020. Davie contends on appeal that the circuit court abused its discretion, 1) in denying his request to introduce evidence of the victim's prior consensual sexual encounters, arguing that such was relevant and admissible under an exception to the rape shield statute, Section 491.015, and 2) in denying his request to introduce evidence of the victim's bias against homosexual behavior, arguing that such was relevant and probative to show that the victim had a

---

[1] All statutory references are to the Revised Statutes of Missouri as updated through January 1, 2017, unless otherwise noted.

motive to lie about whether he consented to the homosexual activity, and that the victim understood the consequences of sexual activity. We affirm and remand to the circuit court for entry of a nunc pro tunc order to correct a clerical error.[2]

### Factual and Procedural Background

Davie does not challenge the sufficiency of the evidence to support his convictions for sodomy in the first degree and incest. The victim, J.Y., is Davie's biological son. J.Y. was thirty-two years old at the time of the charged offenses. Davie was charged with first-degree statutory sodomy for having deviate sexual intercourse on April 26, 2017, with J.Y, who was incapable of consent because of a mental disease or defect, by touching J.Y.'s anus with Davie's penis. Davie was also charged with one count of incest for engaging in deviate sexual intercourse on April 26, 2017, with J.Y.[3]

Viewed in the light most favorable to the verdicts, the evidence at trial showed that J.Y. had experienced physical and intellectual disabilities since birth. J.Y. and a twin sister were born premature and developed hydrocephalus, or "water on the brain." J.Y.'s twin sister died at the age of eleven. J.Y. graduated from a special needs high school. As an adult, J.Y. cannot bathe himself, manage his medications, cook using the stove or oven, or do many other things independently. J.Y. cannot drive, or navigate the city bus system. J.Y.'s mother ("Mother") has durable Power of Attorney that allows her to make medical decisions for J.Y. J.Y. is able to use the telephone. He enjoys singing in his church choir. J.Y. has always lived with Mother. He presently lives with

---

[2] We remand solely to direct the circuit court to correct, nunc pro tunc, its written judgment to conform with its orally-pronounced sentence. *See McArthur v. State*, 428 S.W.3d 774, 781-82 (Mo. App. 2014).

[3] Davie was additionally charged with first-degree burglary for remaining unlawfully in an inhabitable structure for the purpose of committing incest therein, but the State dismissed that charge prior to trial.

2

Mother and a younger sister ("Sister") in Kansas City. J.Y. works at a sheltered workshop for adults with intellectual disabilities.

To Mother's knowledge, J.Y. has had one girlfriend in the past. The girlfriend also had intellectual disabilities. J.Y. went on a date one time and asked his mother to drive him and his friends to the movies at Ward Parkway. Because J.Y. often has his mouth open and stares at people, J.Y.'s mother advised him not to stare because someone might misinterpret that as J.Y. wanting to fight. She also advised J.Y. not to giggle or laugh at anyone, testifying that J.Y. has a "giggle problem," and so she gave him this advice to ensure that he would "get out safely" from the movies.

Mother testified that Davie "ran out" of their marital relationship around 2003, and Mother had not seen Davie for years. Although Davie at one time lived in the same residence that Mother, J.Y, and Sister now live, as far as Mother knew, Davie had never come to the house to visit the children after leaving in the early 2000's. Sister testified that she had never seen Davie stop by the home. Mother had been informed that Davie visited J.Y. one day at work, and then took him to get a haircut. Mother did not learn of this until after it had occurred.

Because of J.Y.'s, Mother's, and Sister's work schedules, there was about a thirty-minute window of time in the afternoon of April 26, 2017, when J.Y. was home alone. Mother arrived home at 3:30 p.m. and noticed an unfamiliar van parked outside the home. When Mother walked inside, she saw J.Y. sitting on the couch with his pants and underwear down to his ankles. Mother believed that J.Y. was getting dressed to go to a planned birthday party in Lee's Summit, so she went to her bedroom and laid down on her bed because she was tired. Mother then heard the pantry door close and footsteps that were too quick to be J.Y.'s. Mother heard the front door and started calling for J.Y. J.Y. eventually appeared at Mother's bedroom door. Mother asked who

3

had just gone out the door. When J.Y. did not respond, Mother raised her voice and demanded to know who had just gone out the door. J.Y. responded, "My daddy."

Mother asked J.Y. what Davie was doing there. J.Y. ultimately told Mother that Davie had sex with him, and described that he was laying on the couch and his dad got on top of him. Mother was very surprised to hear this and "just couldn't believe it." Mother called Davie's sister to obtain Davie's telephone number, but the sister told her that she did not know it. Mother then advised J.Y. that she would be taking him to the doctor after the birthday party, and that he was not to mention this incident at the party. Davie had left a jacket at the home which Mother later turned over to police. Mother later discovered that Davie and J.Y. had been speaking on the phone prior to April 26, 2017.

After the birthday party, Sister drove Mother and J.Y. to St. Joseph's Hospital. Mother advised J.Y., "If your daddy didn't do anything, don't lie. Don't ever lie on anyone. You just need to tell the truth. Just what happened."

Nurse Susan Kiger conducted a sexual-assault examination. During the exam, J.Y. said that Davie told him to take his pants off and lie down on the couch. When J.Y. complied, Davie "lifted [J.Y.'s] legs and put his penis in [J.Y.'s] bottom." Kiger asked if Davie put his penis in and out several times. J.Y. said, "No, he put it in and out, then he heard Mom and he left. Otherwise, he would still be doing it longer."

J.Y. tightened up and pulled away when Kiger tried to examine J.Y.'s anus, so she was unable to get a good look. J.Y. did not allow Kiger to gather an anal swab, but J.Y. swabbed his own rectum while Kiger supervised. Forensic specialist Emily Warren analyzed the swab. Davie's DNA was present on the anal swab along with J.Y.'s and that of an unknown contributor.

4

J.Y. testified that on April 26, 2017, he arrived home from work and was preparing to get ready to go to his aunt's birthday party. He heard a knock on the door and saw Davie's van outside. J.Y. opened the door and was surprised to see his father. Davie asked J.Y. if anyone else was home, and J.Y. told him there was not. Thereafter, "sexual stuff happened." When asked how J.Y. knew that things were becoming sexual, J.Y. stated: "He begins to touch himself." This occurred after Davie had unzipped his pants. Davie asked J.Y. to remove his pants and underwear. J.Y. complied because he "didn't want to be disobedient to him." When J.Y. was asked what part of Davie's body was touching what other party of his body, J.Y. stated: "His penis was in my rectum." J.Y. testified that J.Y. was on the couch bending over. J.Y. started out laying on his back, and then turned over and laid on his stomach. Davie was "standing behind on the couch." Davie put his penis in J.Y.'s rectum until Mother got home. Davie ran and tried to hide in the kitchen when Mother opened the door. Davie then ran out of the house when Mother went to her bedroom.

J.Y. testified that Mother asked him who had been in the home, and he was scared to tell her for fear he would "get in serious trouble." J.Y. told Mother that, "my dad was here and we were just fooling around or something like that." He testified that Davie left his leather jacket at the house.

On cross-examination, J.Y. testified that he had had several girlfriends in the past. He had loved one of those girlfriends and wanted to get married. He believes that "trust" is important in a relationship. J.Y. testified that he understands what "masturbation" and "sex" is. When asked if it was true that J.Y. spoke with his father on the phone once in a while, J.Y. responded: "Yes. And before you go any further, I didn't want to be disrespectful to him because that's my dad." He went on to state that children are not supposed to be disrespectful to their parents, "even though in my heart, I wanted to tell him to get out, but I didn't."

5

When asked to explain further what J.Y. had meant by "fooling around" he stated: "I guess, gay sex. I don't know." J.Y. testified that both he and Davie were masturbating. J.Y. testified that if something similar were to happen again, he would "definitely" say no. Defense counsel asked if "feelings" got in the way, and J.Y. testified that, "We felt some type of way for each other and things just went as they went." J.Y. responded affirmatively when asked if he meant "sexual feelings" and "sexual desire." J.Y. also responded affirmatively when asked if he "maybe took some pleasure" in the event, acted like he was enjoying it, that he had an erection while this was happening, and that he was touching himself when Davie's penis was in his rectum. When asked if J.Y. had an orgasm during this encounter, J.Y. responded, "A little bit, yeah."

Forensic psychologist Matthew Fowler testified that he was retained by the State to form an opinion as to whether J.Y. had the capacity to consent to sexual activity with Davie in April 2017. Fowler concluded that J.Y. did not have that capacity. Fowler testified that, while people with intellectual disabilities have cognitive deficits, they are typically "normal" in any other sense and will have sexual urges and can be sexually aroused. Fowler testified that people with intellectual disabilities may have a biological sex drive, but be unable to consent to sexual intercourse. With regard to making this determination for J.Y., Fowler reviewed Department of Mental Health records for J.Y. from 1988 to 2015, interviewed Mother, and interviewed J.Y. Fowler's interview with J.Y. lasted five hours. Fowler concluded that J.Y. did not sufficiently appreciate the potential negative consequences of engaging in sexual intercourse with Davie. Fowler diagnosed J.Y. as having mild intellectual disability and indicated that such individuals are unable to take care of themselves in their day to day lives reliably without significant consistent help. Fowler's conclusion that J.Y. was unable to consent to the sexual contact with his father

6

was based on J.Y.'s intellectual disability as well as J.Y.'s lack of understanding of the potential negative consequences of engaging in sexual activity.

The defense posited a couple of different theories to the jury during trial. One was that Davie's DNA, which was found on J.Y.'s anus, got there through touch DNA – that it might have been on J.Y.'s hands and J.Y. transferred it there himself. The defense also focused on the third unknown contributor to the DNA and stated, "that might be an indication of [J.Y.'s] capacity to consent." The defense admitted that Davie was at J.Y.'s home that afternoon, but asserted that Davie was sneaking out of the home because of his estranged relationship with Mother. The defense suggested that Mother fabricated the allegations and coached J.Y. into the statements he made to investigators because she became jealous when she found out that Davie had met with J.Y. at his work and was trying to reestablish a relationship. The defense suggested that if J.Y. was as highly suggestible as the State alleged, then he would be just as susceptible to Mother's influence and "even more beholden to her because he lives with her." The defense argued that, because there was no sperm found after testing of the anal swabs, no sodomy or incest occurred.

The defense posited the alternate possibility that if any sexual contact did occur, it was consensual and not "hostile" due to there being no injuries observed to J.Y. The defense argued that because J.Y. became aroused and was vocalizing his pleasure with regard to the encounter, Davie could not have known that J.Y. was incapable of consent.

The defense discussed the various factors Dr. Fowler used in determining if someone has the capacity to consent, and argued various instances within J.Y.'s testimony where he showed that he had that capacity. The defense also argued that this type of encounter might be the only type of sexual activity J.Y. could "sneak in" because a visit from his father looked innocent and J.Y. could not "drive to the gay bar" or otherwise "maintain a romantic relationship with a man." The defense

7

argued that, while children cannot consent to sexual activity with their father, J.Y. can; he has sexual feelings that he does not have the freedom to fulfill, and while he may have made a poor choice in engaging in sexual activity with his father, it was still his choice.

On May 10, 2019, the jury found Davie guilty of one count of sodomy in the first degree and one count of incest. The trial court found Davie to be a prior offender and a persistent sexual offender, due to pleading guilty in 1993 to the felony of attempted sodomy of a five-year-old child. On July 23, 2019, Davie was sentenced to life without the possibility of parole for sodomy, and a term of two years in prison for incest. The judge orally pronounced that the sentences would run consecutively, but the written Judgment states that the sentences are to run concurrently.

This appeal follows.

## Standard of Review

"Circuit courts retain wide discretion over issues of relevancy and admissibility of evidence." *State v. Prince*, 534 S.W.3d 813, 818 (Mo. banc 2017). "The circuit court's discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* On direct appeal, we review the circuit court's ruling for prejudice, not mere error, and will reverse only if the error was so prejudicial that there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial. *Id.*; *State v. Wood*, 580 S.W.3d 566, 574 (Mo. banc 2019).

## Point I – Evidence of Prior Sexual Encounters

In his first point on appeal, Davie contends that the circuit court abused its discretion in denying his request to introduce evidence of J.Y.'s prior consensual sexual encounters, arguing that the evidence was relevant and admissible under the exception to the rape shield statute. Davie argues that Section 491.015 permits evidence of specific instances of sexual activity as evidence

of consent and capacity to consent. Davie argues that this information was relevant to show whether J.Y. was capable of consenting, not whether he did consent. Davie contends that Dr. Fowler testified that it was possible for J.Y. to consent to sexual activity under certain circumstances, but in the case of J.Y. with Davie, J.Y. made an unreasonable judgment. Davie reasons that if the jury could have heard evidence of J.Y.'s other sexual activity along with J.Y.'s in-court testimony that suggested J.Y. was taking an active part in the encounter with Davie – such as taking his own clothes off, masturbating during the encounter, and that the two had "felt some type of way for each other and things just went as they went" – that the jury might have concluded that J.Y. had the capacity to consent to the sexual encounter with Davie. Davie argues that, had the evidence been admitted, there is a reasonable probability that the jury would have reached a different conclusion.

The defense made various offers of proof with regard to evidence that it believed was admissible under Section 491.015.1(1) and (3). The defense made offers of proof with testimony from Sister, Mother, a nurse, and J.Y. Sister testified that Mother once found a condom that Sister presumed was J.Y.'s. Mother testified that she did not remember finding a condom in J.Y.'s room. Mother had found a balloon that J.Y. used to touch himself with. Mother did not know if he used it to touch his naked penis, or if he just rubbed it on the inside of his pants. A nurse testified that Mother informed the nurse that J.Y. was not sexually active.

J.Y. testified in the defense's offer of proof that Davie and J.Y. would have phone sex on the telephone. J.Y. never told anyone about the phone sex because he did not want it spread over social media. J.Y. had viewed pornography on the internet. J.Y. testified that in high school he

9

had a friend who was gay, and the two had romantic feelings for each other.[4]  J.Y. had experienced

homosexual thoughts and feelings.  J.Y. would speak to gay men on his telephone and exchange

pictures.  J.Y. testified that he had had sex with one of his girlfriends.

As relevant to Davie's claims on appeal, Section 491.015 states, in part:

> 1. In prosecutions under chapter 566 or prosecutions related to sexual conduct under chapter 568, opinion and reputation evidence of the complaining witness' prior sexual conduct is inadmissible; evidence of specific instances of the complaining witness' prior sexual conduct or the absence of such instances or conduct is inadmissible, except where such specific instances are:
>
> (1) Evidence of the sexual conduct of the complaining witness with the defendant to prove consent where consent is a defense to the alleged crime and the evidence is reasonably contemporaneous with the date of the alleged crime; or
>
> ….
>
> (3) Evidence of immediate surrounding circumstances of the alleged crime;
>
> ….
>
> 2. Evidence of the sexual conduct of the complaining witness offered under this section is admissible to the extent that the court finds the evidence relevant to a material fact or issue.[5]

We find that the evidence Davie sought to admit regarding J.Y.'s prior sexual conduct was

inadmissible under Section 491.015.  The exception to the general prohibition against evidence of

specific instances of prior sexual conduct of the complaining witness, found at Section

491.015.1(1), only allows evidence regarding the complaining witness's sexual conduct if consent

is a defense to the crime.  Davie concedes that consent was not an issue in this case.  As consent

---

[4] J.Y. testified in a deposition that was attached to Davie's pretrial "Motion to Allow Evidence of Sexual History" that the two never engaged in sex.

[5] If the challenged evidence does not fall within one of the exceptions, then it is inadmissible and not subject to a relevancy review under subsection two of the statute.  *State v. Smith*, 157 S.W.3d 379, 382 (Mo. App. 2005).

was not an issue, Section 491.015 expressly barred this evidence from being introduced at trial. J.Y.'s *capacity to consent* was the issue here. We disagree with Davie's claim that the exceptions under Section 491.015 permit evidence of specific instances of sexual activity as evidence of "capacity to consent" as well as consent. Consent and the capacity to consent are two wholly separate concepts and the statute makes no mention of a complaining witness's capacity to consent. This court may not add language to a clear and unambiguous statute. *State ex rel. Young v. Wood*, 254 S.W.3d 871, 873 (Mo. banc 2008).[6]

The exception under Section 491.015.1(3) is equally inapplicable as the evidence Davie sought to admit regarding J.Y.'s prior sexual conduct would have offered nothing with regard to the immediate surrounding circumstances of Davie's April 26, 2017, sexual encounter with J.Y. This exception applies when the sexual conduct precedes the offense immediately or by a short interval of time and tends, as background information, to elucidate a main fact in issue. *State v. Smith*, 157 S.W.3d 379, 383 (Mo. App. 2005) (citing *State v. Sherman*, 637 S.W.2d 704, 706 (Mo. banc 1982). Aside from the fact that the offers of proof provided no context with regard to how recently J.Y.'s prior sexual conduct had occurred, as noted above, this evidence does nothing to elucidate the main issue of J.Y.'s capacity to consent.

Although Davie argues in the body of his brief that the rape shield statute may not be applied so strictly as to deprive the defendant of the fair trial comprehended by the concept of due process, citing *State v. Samuels*, 88 S.W.3d 71, 82 (Mo. App. 2002), he fails to explain how

---

[6] Further, this subsection, when applicable, only allows evidence of sexual conduct between the complaining witness and the defendant. The only sexual conduct evidence regarding J.Y. and Davie that Davie sought to admit in his offers of proof was the evidence regarding Davie engaging in "phone sex" with J.Y., although when making the offers of proof, defense counsel incorporated all previous arguments made on the topic. J.Y. testified in a deposition to prior instances of sexual contact with Davie.

11

exclusion of the specific evidence that he advocates deprived him of due process. The fact that J.Y. may have previously engaged in phone sex with Davie (or shared pictures with gay men over his phone, watched pornography, had romantic feelings for a fellow high school student, and previously engaged in sex with a female) does nothing to support that J.Y. had the capacity to consent to Davie touching J.Y.'s anus with Davie's penis on April 26, 2017. None of these situations involved the type of sexual conduct that occurred between J.Y. and his father, and participation is simply not equivalent to having the capacity to consent to that participation. Dr. Fowler's testimony explained that the ability to experience certain sexual feelings and urges does not necessarily mean that the person experiencing those has the capacity to consent to specific sexual activity with another person. The judicially created "right to a fair trial" exception to Section 491.015 typically requires evidence that directly refutes evidence that tends to show a defendant's guilt. *State v. Cooper*, 581 S.W.3d 677, 682 (Mo. App. 2019). Nothing about this proposed evidence speaks to J.Y.'s capacity to consent to the sexual activity that occurred with his father on April 26, 2017, during the small window of time J.Y. was home alone and his father showed up unannounced. Therefore, it had little, if any, probative value to the issues before the jury.

Further, despite Davie advocating for admission of the evidence, it would have likely been highly prejudicial to Davie. Had evidence of J.Y.'s prior sexual conduct been allowed, the jury would have learned that Davie initiated the phone sex with J.Y. and that April 26, 2017 was not the first time Davie had anal sex with J.Y. In support of Davie's pre-trial "Motion to Allow Evidence of Sexual History," Davie attached Exhibit A, which was an August 3, 2018, deposition of J.Y. taken by the defense. Therein, J.Y. discusses that Davie would call him late at night after Mother and Sister had gone to bed, and "would want to have phone sex every night." J.Y. testified

12

that "He'd call numerous times, numerous times, one after the other, one after the other." J.Y. testified that he had to answer the phone because, "I had to, I mean, that's my daddy …" Davie would call from the Crescent Hotel or Arrowhead Inn, which were places he was apparently living at the time. J.Y. testified that Davie "would try to talk all sweet to me" with Davie telling him, "'I want to get you off to myself, I want to do this and do that, and do all sorts of things to you.'" J.Y. stated that he never told anyone about this because he was afraid he would be in trouble if he "leaked the information." J.Y. testified that in "trying to show him that I was obedient, not trying to disobey him or anything like that," J.Y. went along with the conversations and responded to Davie with things like, "I want you too, all this kind of stuff, and I really didn't want that, but I had to show him that I knew what he was trying to do, even though deep down in my heart, I didn't want to do that."

When asked in his deposition if anything similar to the event of April 26, 2017, had previously happened, J.Y. stated, "This has happened quite a few times." He testified that it happened a couple of times at a home on "9th Street" where Davie was residing at the time, and a couple of times at the home where J.Y. presently lives. At the 9th Street location, J.Y. was in his twenties and Davie wanted J.Y. to spend the night at Davie's home. J.Y. did not feel comfortable doing so, but did anyway. J.Y. laid at the opposite end of the bed from Davie, "but then he came down to my end of the bed and started touching me again." Davie touched J.Y.'s rectum "which was kind of uncomfortable" and J.Y. guessed that he could have said "no" and "don't do that, but … I guess I was getting in the mood or something[.]" J.Y. followed that with, "If he wanted that he could have got it from any woman out here, it didn't have to be me." J.Y. testified that Davie had sex with J.Y. that night. J.Y. was asked if there were times J.Y. said "yes" to Davie's sexual contact and J.Y. responded, "Yes. Yes, there has been times that I said yes and really didn't mean

13

it, but I didn't know how to tell him no because I already knew that if I told him no, he'd get mad and start beating me with things. You know how parents are." J.Y. further stated that he felt like if he had said "no," Davie would have made him do it anyway. J.Y. was asked if this was something that Davie forced J.Y. to do, or if it was something that Davie asked permission to do. J.Y. testified, "He forced me into it." Similarly, J.Y. was asked if Davie ever asked J.Y., "Can I do this?" J.Y. responded, "… [H]e'd just take it … He just takes it." J.Y. admitted that he allowed himself to receive sexual gratification from the encounters and stated: "And I kept going back to the same thought, like, I really enjoy this, but the real truth behind it is that I did not like this, at all."

Significantly, the jury actually heard J.Y. testify at trial regarding the April 26, 2017 incident and how he and Davie were masturbating near each other, that "we felt some type of way for each other and things just went as they went," and that "you can't stop those feelings from happening." The jury heard J.Y. testify that he took some pleasure in the incident, that J.Y. acted like he was enjoying it, that J.Y. had an erection during the interaction, and that J.Y. was touching himself when Davie's penis was in J.Y.'s rectum. The jury also heard that there had been times prior to April 2017 that Davie had asked J.Y. to do something and J.Y. told him "no." Despite hearing this evidence, the jury concluded that J.Y. did not have the capacity to consent to the sexual contact with Davie on April 26, 2017. We find no reasonable probability that, had additional evidence regarding J.Y.'s sexual conduct or sexual feelings been allowed, the jury would have concluded otherwise.

The circuit court did not abuse its discretion in excluding evidence related to J.Y.'s prior sexual conduct as the evidence was inadmissible under Section 491.015.

Davie's first point on appeal is denied.

14

**Point II – Evidence of Homosexual Bias**

In Davie's second point on appeal, he contends that the circuit court abused its discretion in denying Davie's request to introduce evidence of J.Y.'s bias against homosexual behavior, arguing that the evidence was relevant and probative to show J.Y. had a motive to lie about whether he consented to the homosexual activity with Davie, and that J.Y. understood the consequences of sexual activity. Davie argues that there is a reasonable probability that, had the evidence not been excluded, the jury would have reached a different verdict.

Davie made offers of proof on this issue consisting of Sister's, Mother's, and J.Y.'s testimony. Sister testified that Mother and J.Y. attend a church that regards homosexuality as sinful. Sister perceived this from observing a church member who found out that one of their children was homosexual. The church member tried to figure out a way for the child to not be gay, and prayed that the child was not homosexual. Sister assumed that J.Y. was aware that his church regards homosexuality as a sin. Sister testified that Mother regards homosexuality as a sin, and Sister assumed J.Y. was aware of this.

Mother testified that the church she and J.Y. attend regards homosexuality as a sin, and that Mother does as well.

J.Y. acknowledged that his church believes homosexuality is sinful. With regard to J.Y.'s own sexual conduct and the church's position, he stated: "But they don't know because I don't tell them."

We find that, as J.Y.'s consent was not an issue in this case and the jury was required to determine whether J.Y. had the capacity to consent to the sexual activity that occurred with his father, any motive J.Y. might have had to lie about the activity is irrelevant. Further, there was no evidence that J.Y. ever denied or lied about the sexual encounter with Davie. J.Y.'s knowledge

15

about Mother's or the church's position on homosexuality is simply irrelevant to J.Y.'s capacity to consent.

The circuit court did not abuse its discretion in excluding evidence related to J.Y.'s knowledge of his mother's and church's position on homosexuality as it was irrelevant to the issue of whether J.Y. had the capacity to consent to sexual contact with Davie.

Davie's second point on appeal is denied.

### Correction of Written Judgment

The State notes that the circuit court orally pronounced consecutive sentences of life without the possibility of parole for the sodomy count, and a term of two years in prison for the incest count.[7] Despite that pronouncement, the circuit court's written judgment purports to impose concurrent sentences.

> If there is a material difference between the trial court's oral pronouncement of sentence and the written judgment, the oral pronouncement of sentence controls. *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010). 'The failure to memorialize accurately the decision of the trial court as it was announced in open court [is] clearly a clerical [mistake].' *State v. Taylor*, 123 S.W.3d 924, 931 (Mo. App. S.D. 2004).

*McArthur*, 428 S.W.3d at 781-82. "Clerical errors in the sentence and judgment in a criminal case may be corrected by order nunc pro tunc if the written judgment does not reflect what was actually done." *State v. Knox*, 604 S.W.3d 316, 325 (Mo. banc 2020) (internal quotation marks and citation omitted); Rule 29.12(c). The State suggests a remand for a nunc pro tunc order fixing this clerical error; Davie did not file a reply brief responding to this suggestion.

---

[7] This oral pronouncement conforms with Section 558.026 which requires sentences to run consecutively in the case of multiple sentences of imprisonment imposed for an offense committed during or at the same time as, among other things, the offense of first-degree sodomy.

**Conclusion**

We remand and direct the circuit court to correct its written judgment to impose consecutive sentences for Davie's sodomy and incest convictions.  In all other respects, the circuit court's judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

17